**E-FILED**
Wednesday, 06 September, 2006  03:46:53 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **BLOOMINGTON PARTNERS, LLC, a** | ) | |
| **limited liability company, BARRY KEMP,** | ) | |
| **RICHARD ADAMS, and DAVID LeFEVRE,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 04-CV-2287** |
| | ) | |
| **CITY OF BLOOMINGTON, an Illinois** | ) | |
| **municipal corporation; JOHN BUTLER;** | ) | |
| **individually and d/b/a BUTLER COMPANY,** | ) | |
| **LLC; JB BUTLER COMPANY, LLC;** | ) | |
| **MICHAEL NELSON; MNELSON** | ) | |
| **COMPANY, LLC; CENTRAL ILLINOIS** | ) | |
| **ARENA MANAGEMENT, INC.; BNAM,** | ) | |
| **LLC; LARRY HUNDMAN; and THOMAS** | ) | |
| **HAMILTON,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION

This case is before the court for ruling on the Motion for Summary Judgment (#85) filed by Defendant City of Bloomington.  This Motion was renewed on May 30, 2006 (#104), following the filing of a Second Amended Complaint (#95) by Plaintiffs, Bloomington Partners, LLC, Barry Kemp, Richard Adams, and David LeFevre.  A Motion for Partial Summary Judgment (#89) filed by Defendants John Butler, individually and d/b/a Butler Company, LLC, JB Butler Company, LLC, Michael Nelson, MNelson Company, LLC, and Central Illinois Arena Management, Inc. is also before the court for ruling.  In addition, Plaintiffs have filed a Motion to Strike Portions of the Reply Brief filed by the City of Bloomington (#123).  Following this court's careful review of the documents filed by the parties and the arguments of the parties, this court rules as follows: (1) Plaintiffs' Motion to Strike (#123) is DENIED; and (2) the Motions for Summary Judgment (#85, #89, #104) are GRANTED.

FACTS[1]

This case arises out of the development of a sports and entertainment center by the City of Bloomington (City).  It is undisputed that Defendants John Butler and Michael Nelson have been working with the City since at least 2000 in planning, developing and constructing a sports arena to house a hockey franchise and cater to other local entertainment events (Arena Project).  In January 2002, the City entered into a Consulting and Sales Agreement with Central Illinois Arena Management, Inc. (CIA), an Illinois corporation.  Nelson is president of CIA and Butler is its secretary.  The agreement stated that the City "hereby appoints CIA as its exclusive agent providing consulting services related to the design and marketing of the [Arena] Project and to procure third party funding sources for the development of the Project."

In July 2003, Butler and Nelson, along with Plaintiffs Kemp, LeFevre and Adams, agreed to make a proposal to the City in the name of "Bloomington Partners" under which they would manage the Arena Project.  They prepared a "Term Sheet" which set out the terms of their proposal and presented it to Tom Hamilton, City Manager for the City, for the City's consideration.  Later in 2003, the City accepted the terms of the Term Sheet, and the parties agreed that the next step was for Bloomington Partners to draft a written management agreement.  LeFevre, who is a licensed attorney, worked on preparing a proposed Management Agreement.  In December 2003, LeFevre sent the City's attorney, Todd Greenburg, a draft Management Agreement which included Exhibits A through H.  In early April 2004, Greenburg asked LeFevre to prepare a final draft of an agreement to reflect terms that had been agreed upon between Greenburg on behalf of the City and LeFevre on

---

[1] The facts are taken from the parties' statements of undisputed facts and the documents provided by the parties.

2

behalf of Bloomington Partners.[2]

On April 26, 2004, a public meeting was held, and the City Council voted on the "Development and Management Agreement" (Management Agreement) between the City and Bloomington Partners LLC (BP) prepared by LeFevre.  The City Council accepted and approved the Management Agreement by an 8-0 vote.  On April 27, 2004, Mayor Judy Markowitz signed the Management Agreement on behalf of the City.  Several days later, on May 3, 2004, Articles of Organization were filed establishing BP as a limited liability company.  At that time, Defendants Butler and Nelson were members of BP.  Also on May 3, 2004, in compliance with its obligations under the Management Agreement, BP tendered a "Pre-Opening Budget" to Hamilton for approval by the City. It is undisputed that the City Council never voted to approve the Pre-Opening Budget proposed by BP and repeatedly "laid over" a vote on this issue.  On May 10, 2004, a press release was issued.  The press release was prepared by Nelson and approved by Hamilton.  It stated that BP had signed a 10-year facility management agreement with the City, set out some of the details of the agreement, and provided biographies of the five individuals involved in BP.  However, it is undisputed that no one ever signed the Management Agreement on behalf of BP.

The Management Agreement included paragraph 16.2, which set out a lengthy cooperation/mediation provision.  Paragraph 16.2(a) provided that "any dispute arising hereunder will first be referred to the parties' respective agents or representatives prior to either party initiating a legal suit, who will endeavor in good faith to resolve any such disputes within the limits of their authority and within ninety (90) days after the commencement of such discussions." Paragraph 16.2 further provided that, if any dispute remained unresolved, it would be subject to mediation and, if that was unsuccessful, arbitration.  Paragraph 16.2(h) provided that a party could file a complaint

---

[2] This court notes that it agrees with the City that Greenburg did not have the authority to bind the City to any agreement not approved by the City Council.

to seek a preliminary injunction if such action was necessary to avoid irreparable damage or to preserve the status quo.

The Management Agreement also provided that "[t]he term of this Agreement shall commence on the date of execution of this Agreement and shall expire on the date ten (10) years subsequent to the date of the first public event held in the Arena."  The Agreement also provided:

> BP represents and warrants to the City the following: (i) all required approvals have been obtained, and BP has full legal right, power and authority to enter into and perform its obligations hereunder, and (ii) this Agreement has been duly executed and delivered by BP and constitutes a valid and binding obligation of BP, enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally or by general equitable principles.

On April 26, 2004, at the same City Council meeting at which the Management Agreement was approved, the City Council approved a "Pre-opening Sales and Management Agreement" with CIA.  On April 27, 2004, this agreement was signed by Mayor Markowitz and was also signed by Nelson, as president of CIA, and Butler, as secretary of CIA.  This agreement provided, in Paragraph 18, that "the City shall negotiate in good faith with CIA to enter into a Management Agreement for the operation and management of the sports and entertainment center which Agreement shall take effect upon substantial completion and opening of the Center.  Further, CIA shall have a right of first refusal with respect to any Management Agreement the City may negotiate with another entity." Paragraph 17 set out the compensation to be paid to CIA by the City.  The Agreement also stated

4

that "Paragraphs 17 and 18 shall survive termination of this Agreement except if replaced by a pre-opening agreement under the terms and conditions set forth by the agreement with Bloomington Partners."

On November 22, 2004, a City Council meeting was held.  The record of the council proceedings shows that Hamilton prepared a memorandum for the City Council.  In this memorandum, Hamilton stated that BP had not signed the Management Agreement and that, "therefore the City has no contract with Bloomington Partners."  Hamilton also stated that he had learned that BP did not have an internal operating agreement.  Hamilton stated that Butler and Nelson had worked very hard under their contract with the City, a contract which remained in effect. Hamilton stated that a group called BNAM was in a position to assume under the same terms and conditions BP's offer to operate and manage the Center.  Hamilton recommended that the City Council rescind the previous action approving the Management Agreement between the City and BP.  At the meeting, Hamilton told the City Council that there was no signed agreement with BP. Following a discussion by City Council members, a motion was made "that the previous agreement with Bloomington Partners, LLC be rescinded, and City staff directed to develop a Management Agreement with BNAM containing like terms and conditions."  The motion also directed City staff to bring back a negotiated agreement with BNAM under the same financial terms on December 13, 2004, the date of its next meeting. The motion carried with a unanimous vote of the City Council members present at the meeting.  On November 29, 2004, Butler and Nelson submitted a written resignation from BP.

On December 10, 2004, BP filed its Verified Complaint (#1) against the City.  BP stated that its members are: Beacon Sports Properties, LLC, a Delaware limited liability company; Richard Adams, a citizen and resident of New Jersey; the Sporting Life, LLC, a California limited liability

company; and Kemp Entertainment, LLC, a Nevada limited liability company.  On December 20, 2004, BP submitted a Notice of Jurisdictional Statement (#14) which set out the citizenship of all of BP's members and showed that none of its members are Illinois residents or citizens.  This court therefore entered an Order (#15) and concluded that this court has jurisdiction over this case based upon diversity of citizenship.  See Belleville Catering Co. v. Champaign Marketplace, LLC, 350 F.3d 691, 692 (7th Cir. 2003).

In its Verified Complaint, BP sought an injunction requiring the City to engage in the dispute resolution procedures set out in Paragraph 16.2 of the Management Agreement between BP and the City.  Count I of the Complaint alleged breach of contract and Count II was based upon promissory estoppel.  BP also filed a Motion for Temporary Restraining Order (#3).  BP sought a temporary restraining order enjoining the City from repudiating BP's Management Agreement and from negotiating or approving a new agreement with a third party, pending arbitration proceedings, as required by the Management Agreement.

A hearing was held on December 13, 2004.  After reviewing the exhibits presented, hearing argument and hearing the testimony of LeFevre, principal in Beacon Sports Properties, this court concluded that BP had not met its burden to establish that an unambiguous, complete, and fully executed contract existed between the parties.  This court noted that BP had provided only an unsigned copy of the Management Agreement.  This court also agreed with the City's argument that it was unclear whether the exhibits referred to in the agreement had been submitted at the time the City Council adopted and approved the agreement in April 2004.  This court also concluded that BP failed to show that the City made unambiguous promises that were relied upon by BP.  This court further noted that BP had not shown a reasonable likelihood of success on the merits or that it had an inadequate remedy at law.  This court indicated that damages for breach of contract would be

"easily determinable." This court therefore concluded that the requirements for injunctive relief had not been met. Accordingly, BP's original Motion for Temporary Restraining Order (#3) was DENIED.

The evening of December 13, 2004, after BP's Motion for Temporary Restraining Order was denied, the City and BNAM entered into a Development and Management Agreement. This agreement was substantially similar to the Management Agreement. It is undisputed that Nelson and Butler have continued their involvement with the Arena Project and have been paid pursuant to the Pre-opening Sales and Management Agreement between the City and CIA.

On March 24, 2005, BP filed its Second Motion for Temporary Restraining Order and Preliminary Injunction (#23), with attached exhibits, and a Memorandum of Law in Support (#24). BP stated that it had received written discovery responses from the City which erased "any possible doubt" that BP and the City entered into an unambiguous agreement in April 2004. In its Motion, BP requested that this court enter a temporary restraining order prohibiting the City from performing any term of the BNAM Agreement or directly cooperating with BNAM in the performance of any such contract, or negotiating a management or development agreement with any other person or entity until further order of court and directing the parties to pursue the dispute resolution procedures set forth in the Management Agreement.

In Response, the City argued that no valid, enforceable contract existed between the parties which required the City to engage in dispute resolution procedures with BP. The City contended that no complete, unambiguous agreement existed. The City pointed out that the Management Agreement was never executed by BP. The City also provided evidence that the City Council had never terminated its agreement with CIA. Based upon this evidence, the City argued that the current contract between the City and CIA showed that no enforceable contract existed between BP and the

7

City.  The City further contended that a review of Exhibits C and D shows that they are three-way agreements which are hopelessly ambiguous, unexecuted and unenforceable.

A hearing was held on April 1, 2005.  Following the hearing, this court entered a lengthy Order (#29) which denied Plaintiff's Second Motion for Temporary Restraining Order and Preliminary Injunction.  This court concluded, based upon the documents before the court, that the Management Agreement never became an enforceable agreement between the parties.  Following its careful review of all of the exhibits submitted by the parties, this court concluded that it was clear that it was the intention of the parties that the Management Agreement approved by the City Council was a replacement for the Agreement entered into with CIA, which covered much of the same subject matter. It was also clear that the parties intended that Butler and Nelson, as principals of CIA and BP, would be involved in the management of the Arena Project.  The Management Agreement provided that the agreement with CIA would be "terminated simultaneously" with the execution of the Management Agreement.  This court concluded that it was clear from the terms of the Management Agreement that it was not intended to be in effect until it was executed by BP and the Agreement with CIA was terminated.  This court stated that the evidence before the court showed that the Management Agreement was never executed by BP and the Agreement with CIA was never terminated.  Accordingly, this court concluded that the Management Agreement never became an executed, enforceable contract, and the dispute resolution provisions contained in the Management Agreement were not binding on the parties.

This court further concluded that BP's arguments otherwise were not persuasive.  This court concluded that the press release following the City's approval of the Management Agreement, which incorrectly stated that BP signed the Agreement, and the fact that the City Council believed it had to "rescind" the Agreement, did not show that the parties meant to be bound by the Agreement

8

where the clearly expressed intention of the parties in the Agreement stated otherwise.  This court also rejected BP's argument that execution of the Management Agreement was not necessary because it accepted the Agreement by performance.  Under the circumstances here, this court concluded that the parties intended that the Management Agreement had to be executed by BP and the Agreement with CIA had to be "terminated simultaneously" before the Management Agreement became an effective, enforceable contract.

Accordingly, this court stated that BP had not convinced this court that an enforceable, complete, and unambiguous agreement existed which would require the City to engage in dispute resolution procedures with the remaining members of BP, which no longer included Butler and Nelson as principals.  Therefore, this court concluded that BP had not shown a reasonable likelihood of success on the merits and BP's Second Motion for Temporary Restraining Order and Preliminary Injunction (#23) was DENIED.

Subsequently, on April 19, 2005, BP filed its First Amended Complaint (#31) against the following Defendants: the City; John Butler, individually and d/b/a Butler Company, LLC; JB Butler Company, LLC; Michael Nelson; MNelson Company, LLC; Central Illinois Arena Management, Inc.; BNAM, LLC; Larry Hundman; and Thomas Hamilton.  Motions to Dismiss some of the counts of the First Amended Complaint were filed.  On December 23, 2005, this court entered an Opinion (#74) which ruled on the pending Motions to Dismiss.  Defendant Hamilton's Motion to Dismiss Counts IV, V and VI of the First Amended Complaint (#52) was GRANTED.  This court agreed with Defendant Hamilton that he was immune from liability under § 2-201 of the Tort Immunity Act, 745 Ill. Comp. Stat. 10/2-201 (West 2004), based upon Vill. of Bloomingdale v. CDG Enters., Inc., 752 N.E.2d 1090, 1097-1101 (Ill. 2001).  Accordingly, Counts IV, V and VI of BP's First Amended Complaint were dismissed, with prejudice, as to Defendant Hamilton.  Hamilton was

terminated as a party to this action.

However, the Motion to Dismiss Counts IV, V and VI (#54) filed by Defendants BNAM, LLC and Larry Hundman was DENIED.  This court agreed with BP that this court's statement, made in ruling on Plaintiff's motion for a temporary restraining order and preliminary injunction, that "the Management Agreement never became an enforceable agreement" between BP and the City, was not a ruling on the merits of the case and could not be relied upon as the "law of the case."  This court specifically agreed with BP that this court's ruling on the motion for a temporary restraining order and preliminary injunction was not a final determination on the merits of any claims, citing Dupuy v. Samuels, 423 F.3d 714, 721-22 (7th Cir. 2005) and Loewen Group Int'l, Inc. v. Haberichter, 1998 WL 603040 (N.D. Ill. 1998).  This court stated that no final determination has been made in this case regarding the existence of a valid enforceable contract so that BNAM and Hundman had not shown that they were entitled to dismissal of any part of BP's First Amended Complaint.

On April 20, 2006, the City filed a Motion for Summary Judgment (#85).  The City argued that it was entitled to summary judgment because BP could not show the existence of an unambiguous, complete and fully executed contract between itself and the City, noting that the Management Agreement was never signed by any authorized agent of BP and that the Management Agreement referred to many exhibits essential to the contract which were never agreed upon by the parties.  The City further noted that the Management Agreement was subject to a right of first refusal regarding management of the City's arena held by CIA pursuant to an agreement executed by both the City and CIA.  The City also argued that it was entitled to summary judgment on BP's claim based upon equitable estoppel.  In addition, the City argued that it was entitled to summary judgment on BP's state law claims alleging tortious conduct because it is impossible for an entity to tortiously

interfere with its own contract and because the City has immunity under Illinois law from liability for these types of claims. The City asked that judgment be entered in its favor on Counts I, II, IV, V and VI of the First Amended Complaint.

On May 1, 2006, Defendants Butler, individually and d/b/a Butler Company, LLC, JB Butler Company, LLC, Nelson, MNelson Company, LLC, and CIA filed a Motion for Partial Summary Judgment as to Count V of the First Amended Complaint, which alleged that the Defendants were liable to BP for intentional interference with contract. These Defendants argued that, in the event that this court granted the City's Motion for Summary Judgment, then by necessity judgment should be entered in favor of these Defendants on that claim. Defendants argued that the lack of a comprehensive integrated written agreement as a matter of law results in BP being unable to establish a necessary element of the cause of action of intentional interference with a contractual relationship - the existence of a contract.

Subsequently, on May 15, 2006, BP, Barry Kemp, Richard Adams, and David LeFevre filed a Second Amended Complaint (#95) against the same Defendants named in the First Amended Complaint, including Thomas Hamilton. In this Complaint, Plaintiffs alleged that the City and Butler and Nelson brought Kemp, Adams, and LeFevre into the arena project in 2003 because of "their excellent reputations, their financial strength and expertise in developing and managing professional sports-related projects." Plaintiffs alleged that, after the City approved the Management Agreement with BP, BP performed extensive management and development services for the City regarding the arena project. Plaintiffs alleged that "[w]ith the financial strength of Plaintiffs to support[] the project, the City obtained nearly $30,000,000 in general bond obligations financing" and that, with "financing in place, the City began construction of the Arena in August 2004."

In Count I, Plaintiffs alleged breach of express written contract against the City and CIA.

11

Plaintiffs alleged that BP prepared and submitted to the City a proposed Management Agreement in December 2003 which included exhibits or schedules, identified as Exhibits A-H.  Plaintiffs alleged that members of BP ultimately reached agreement on the terms of the Management agreement with City representatives.  Plaintiffs alleged that, in early April 2004, LeFevre prepared the final draft of the Management Agreement, at the request of Todd Greenburg, the City's attorney. Plaintiffs alleged that the Management Agreement referenced and incorporated Exhibits A-H, copies of which had previously been sent to the City with the December draft agreement.  Plaintiffs stated that, in the Management Agreement approved by the City Council on April 26, 2004, BP agreed to:

<blockquote>

a)      Purchase naming rights for the Arena Project for $2,000,000;

b)      Make a further capital contribution of up to $1,000,000 to purchase necessary restaurant concession equipment;

c)      Provide fully paid and debt-free professional hockey and indoor football franchises;

d)      Assume responsibility for all capital costs with respect to the professional sports franchises; and

e)      promote, operate and manage the Arena Project.

</blockquote>

In exchange for these duties and obligations, the Management Agreement provided that BP had the right to resell the naming rights to a third party, retain specified percentages of concession sales, receive a management fee calculated as a percentage of the Arena Project's gross revenues, receive a further incentive fee calculated as a percentage of the Arena Project's operating revenues, and receive additional specified consideration.  Plaintiffs alleged that BP, through its members, provided hundreds of hours of services to the City pursuant to the Management Agreement which included coordination with the City regarding the steps necessary to market municipal bonds, attendance by

members of BP at planning and development meetings and work to obtain necessary contracts for the Arena with third parties.

Plaintiffs also alleged that BP tendered a Pre-Opening Budget for approval by the City, as required by the Management Agreement.  However, the City never voted on the proposed Pre-Opening Budget.  Plaintiffs alleged that the City breached the Management Agreement by: (1) failing to timely vote to accept or reject the Pre-Opening Budget; (2) terminating the Management Agreement without cause and without notifying BP of the termination; and (3) failing and refusing to engage in dispute resolution procedures required by Section 16.2 of the Agreement.  Plaintiffs sought injunctive relief requiring the City to engage in the dispute resolution procedures set out in the Management Agreement and also sought monetary damages in excess of $10,000,000 plus costs.

In Count II, Plaintiffs also sought injunctive relief and monetary damages based upon the breach of an express contract.  However, in this Count, Plaintiffs specifically alleged that BP accepted the contract by performance, alleging that the City was aware of and accepted the benefits of BP's performance of the terms of the Management Agreement.  In Count III, Plaintiffs alleged that the City was liable for breach of contract because "BP reasonably relied to its detriment on the City's actions" of failing to object to the absence of or status of the exhibits, accepting the benefits of BP's performance of the Management Agreement and performing as if the Management Agreement existed in the months following April 2004.  In Count IV, Plaintiffs alleged that, based upon these actions by the City, the City is estopped from raising any issue related to the exhibits and is liable for breach of contract.

In Count V, Plaintiffs alleged that Butler, Nelson and their entities are liable to BP for breach of their fiduciary duty as members of the Bloomington Partners Group and BP.  In Count VI, Plaintiffs alleged that Butler, Nelson and their entities are liable to Plaintiffs Kemp, LeFevre and

Adams for breach of fiduciary duty.  In Count VII, Plaintiffs alleged that Butler, Nelson and their entities are liable to Plaintiffs Kemp, LeFevre and Adams based upon quantum meruit.  In Count VIII, Plaintiffs alleged that the City, Hamilton, BNAM and Larry Hundman, chief operating officer of BNAM, are liable to BP for aiding and abetting Butler and Nelson's breach of fiduciary duty. In Count IX, Plaintiffs alleged that the City, Hamilton, Hundman and BNAM are liable to Kemp, LeFevre and Adams for aiding and abetting Butler and Nelson's breach of fiduciary duty.  In Count X, Plaintiffs alleged that all of the named Defendants are liable to BP for intentional interference with contract.  In Count XI, Plaintiffs alleged all of the named Defendants are liable to BP for intentional interference with economic expectations.  Finally, in Count XII, Plaintiffs alleged that all of the named Defendants are liable to Kemp, LeFevre and Adams for intentional interference with economic expectations.

On May 30, 2006, the City filed a Motion to Renew Motion for Summary Judgment (#104). The City stated that Count I of Plaintiffs' Second Amended Complaint alleged a breach of express contract, as did Count I of the First Amended Complaint.  The City stated that Count IV of the Second Amended Complaint alleged that the City should be estopped from denying the existence of a valid contract, corresponding to Count II of the First Amended Complaint.  The City further stated that Count VIII of the Second Amended Complaint renewed the allegations that the City "aided and abetted" a breach of contract, corresponding to Count IV of the First Amended Complaint; that Count X renewed the allegations that the City interfered with its own alleged contract with BP, corresponding to Count V of the First Amended Complaint; and that Count XI renewed the allegations that the City intentionally interfered with the economic expectations of BP, corresponding to Count VI of the First Amended Complaint.  The City stated that it therefore renewed its Motion for Summary Judgment, following the filing of the Second Amended Complaint,

14

and sought judgment in its favor on Counts I, IV, VIII, X and XI of the Second Amended Complaint.[3]

On June 20, 2006, Plaintiffs filed their Response to the Motions for Summary Judgment (#110).[4]  On July 5, 2006, the City filed its Reply to Plaintiffs' Response to Motion for Summary Judgment (#116).  On July 11, 2006, Plaintiffs filed a Motion to Strike Portions of the Reply Brief (#123).  The City filed its Response to the Motion to Strike (#126) on July 20, 2006.

ANALYSIS

I.  MOTION TO STRIKE

In their Motion to Strike, Plaintiffs argued that portions of the City's Reply Brief should be stricken because the City included new facts and raised new arguments which were not part of its original Motion for Summary Judgment.  Plaintiffs also argued that, alternatively, they should be allowed to file a sur-reply.  In its Response to the Motion, the City argued that any additional facts were included by the City in order to respond to the additional material facts Plaintiffs included in their Response to the Motion for Summary Judgment.  The City also responded to Plaintiffs' argument that the City raised new, inconsistent arguments and contended that its arguments are, in fact, entirely consistent.

This court notes that Motions to Strike are disfavored.  See Sun v. Bd. of Trs. of Univ. of Ill., 429 F. Supp. 2d 1002, 1030 (C.D. Ill. 2006); Clegg v. The Sullivan Corp., 2003 WL 21254558, at *1 (S.D. Ind. 2003).  Generally, it is not this court's practice to grant motions to strike when ruling on motions for summary judgment.  See Sun, 429 F. Supp. 2d at 1030; see also Fenje v. Feld, 301

---

[3]  On August 8, 2006, this court granted the City's Motion to Amend (#105) to correct a typographical error.  The prayer for relief was therefore corrected to state that the City sought judgment as to Count XI rather than Count IX.

[4]  Plaintiffs' Response (#110) was docketed as a response to all three of the pending Motions for Summary Judgment (#85, #89, #104).

15

F. Supp. 2d 781, 789 (N.D. Ill. 2003), aff'd 398 F.3d 620 (7th Cir. 2005). This court has consistently agreed with the district court in Fenje that the best practice is to deny motions to strike related to a motion for summary judgment. See Fenje, 301 F. Supp. 2d at 789. This court is fully capable of considering only factual statements adequately supported by the record and presented in accordance with the Local Rules. Accordingly, Plaintiffs' Motion to Strike (#123) is DENIED.

## II. MOTIONS FOR SUMMARY JUDGMENT

### A. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000), quoting Pipitone v. United States, 180 F.3d 859, 861 (7th Cir. 1999). In making this determination, the court must consider the evidence in the light most favorable to the party opposing summary judgment. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970); Adams v. Wal-Mart Stores, Inc., 324 F.3d 935, 938 (7th Cir. 2003). However, neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment. Michas, 209 F.3d at 692. Moreover, a plaintiff cannot defeat summary judgment by raising immaterial issues of fact. See Jordan v. Summers, 205 F.3d

337, 345 (7th Cir. 2000).

## B.  ENFORCEABLE CONTRACT

As noted, the City argues that it is entitled to judgment in its favor on Count I of Plaintiffs' Second Amended Complaint because this claim is based upon the existence of a contract and Plaintiffs cannot show the existence of an unambiguous, complete and fully executed contract between BP and the City.  The City notes that this court previously found that BP was unlikely to prevail on the merits of its claims and argues that, after engaging in extensive discovery, Plaintiffs are no closer to unearthing any facts which will support their case against the City.  The City argues that it cannot be liable for breach of contract because no contract was ever created between the parties.  The City contends that it is clear from the terms of the Management Agreement that it was not intended to be in effect until it was executed by BP and the Agreement with CIA was terminated. The City argues that, because the Management Agreement was never executed by BP, and the CIA Agreement was terminated only when it was absorbed by the execution of the Pre-Opening Sales and Management Agreement with CIA, the Management Agreement between the City and BP never became an executed, enforceable contract.  The City also argues that the Management Agreement referred to many exhibits essential to the contract which were never agreed upon between the parties.

In their Response, Plaintiffs argue that the City is not entitled to summary judgment on Count I, which alleges breach of contract, because the Management Agreement, drafted by LeFevre, was BP's offer, which was accepted by the City Council and Mayor on April 26-27, 2004.  Plaintiffs contend that a valid, enforceable contract was formed.  Plaintiffs also contend that the exhibits are a non-issue because it is undisputed that BP furnished them to the City prior to the date the City Council approved the Management Agreement.  Plaintiffs further assert that the fact that the City

17

entered into an agreement with CIA does not allow the City to escape its obligations under the Management Agreement with BP, contending that the "fact that someone may bind himself to two incompatible contracts does not allow him to escape his responsibilities under either."  In addition, Plaintiffs argue that BP did not need to sign the Management Agreement because it accepted the agreement by performance.  Plaintiffs also note that this court has already ruled that its determination regarding the existence of a contract in ruling on BP's request for a temporary restraining order and preliminary injunction was not a finding on the merits and argues that "[n]othing presented today warrants a different result."

Summary judgment is not warranted when there are genuine issues of material fact with respect to the interpretation of a contract.  Cherry v. Auburn Gear, Inc., 441 F.3d 476, 481 (7th Cir. 2006).  However, the interpretation of an unambiguous contract is a question of law, and therefore a dispute over the terms of an unambiguous contract is suited to disposition on summary judgment.  Utility Audit, Inc. v. Horace Mann Serv. Corp., 383 F.3d 683, 687 (7th Cir. 2004); Hearns v. Interstate Bank, 2006 WL 862893, at *3 (N.D. Ill. 2006).  "If a contract is unambiguous, by definition no issues of material fact exist regarding the contract's interpretation; that interpretation is a question of law for the court."  Hearns, 2006 WL 862893, at *3, quoting Metalex Corp. v. Uniden Corp of Am., 863 F.2d 1331, 1333 (7th Cir. 1988).  Where the issue is essentially one of contract interpretation, it lends itself to resolution by summary judgment because, while any disputed facts are settled in the nonmovant's favor, the determination of whether a contract is ambiguous is a matter of law.  Barnett v. Ameren Corp., 436 F.3d 830, 833 (7th Cir. 2006).  "Where 'a court can have reasonable confidence that it knows what the contract means,' it can therefore decide the issue at hand on the basis of the contractual language alone."  Hearns, 2006 WL 862893, at *3, quoting Overhauser v. United States, 45 F.3d 1085, 1088 (7th Cir. 1995).

Under Illinois law, which the parties agree governs in this case, contract terms are interpreted according to their plain meaning unless otherwise defined. Utility Audit, Inc., 383 F.3d at 687, citing Trade Ctr. v. Dominick's Finer Foods, 711 N.E.2d 333, 335 (Ill. App. Ct. 1999). "Although words should be given their ordinary and accepted meaning, they must also be viewed in context, and the contract must be considered as a whole in order to ascertain the parties' intent." Utility Audit, Inc., 383 F.3d at 687. "The terms should be construed so that the contract is 'fair, customary, and such as prudent persons would naturally execute,' and is 'rational and probable.'" Utility Audit, Inc., 383 F.3d at 687, quoting Foxfield Realty, Inc. v. Kubala, 678 N.E.2d 1060, 1063 (Ill. App. Ct. 1997). "It is a cardinal principal of contract law that since the language of a contract is the best evidence of the parties' intent, every provision of a contract should be given content and effect, and unambiguous contractual language should be given its plain and natural meaning." In re Vic Supply Co., 227 F.3d 928, 933 (7th Cir. 2000) (Williams, J., concurring).

This court initially notes that it does not agree with Plaintiffs that nothing has changed since this court concluded that dismissal of BP's breach of contract claims was not warranted because this court's prior ruling regarding the existence of a contract was not a ruling on the merits. The case is now before the court in a different posture because a motion for summary judgment has been filed, with supporting documentation. Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 859 (7th Cir. 2005), cert denied, 126 S. Ct. 746 (2005) (citations omitted). Therefore, at this point, Plaintiffs are required to provide this court with sufficient documentation to show that there are genuine issues of material fact precluding summary judgment. The issue has now been fully briefed, the parties have filed all documentation desired, and the issue is now before the court for ruling on the merits.

19

Under Illinois law, if "the parties intended the execution of a formal agreement as a condition precedent, then 'no formal contract arises until the formal agreement is, in fact, executed.'" <u>IK Corp. v. One Fin. Place P'ship</u>, 558 N.E.2d 161, 166 (Ill. App. Ct. 1990), <u>overruled on other grounds</u> by <u>Royal Imperial Group, Inc. v. Joseph Blumberg & Assocs., Inc.</u>, 608 N.E.2d 178 (Ill. App. Ct. 1992), <u>quoting</u> <u>Interway, Inc. v. Alagna</u>, 407 N.E.2d 615, 619 (Ill. App. Ct. 1980); <u>see also Solaia Tech. LLC v. Arvinmeritor, Inc.</u>, 2006 WL 695699, at *5 (N.D. Ill. 2006). "When negotiators say that agreement is subject to a more definitive document, Illinois treats this as demonstrating intent not to be bound until that document has been prepared <u>and signed</u>." <u>PFT Roberson, Inc. v. Volvo Trucks N. Am.</u>, 420 F.3d 728, 731 (7th Cir. 2005) (emphasis added). The intent of the parties regarding a condition precedent is a question of law where the relevant language at issue is unambiguous. <u>Solaia Tech.</u>, 2006 WL 695699, at *5, <u>citing</u> <u>Catholic Charities v. Thorpe</u>, 741 N.E.2d 651, 653 (Ill. App. Ct. 2000). Language that is unambiguous is language susceptible to only one reasonable interpretation. <u>Solaia Tech.</u>, 2006 WL 695699, at *5, <u>citing</u> <u>Moriarty v. Svec</u>, 164 F.3d 323, 330 (7th Cir. 1998). "Conditions precedent may be indicated by terms such as 'on the condition,' 'subject to,' 'when,' 'as soon as,' or other similar terms." <u>Solaia Tech.</u>, 2006 WL 695699, at *5, <u>quoting</u> <u>AAR Int'l, Inc. v. Vacances Heliades, S.A.</u>, 202 F. Supp. 2d 788, 800 (N.D. Ill 2002). However, a "magic-words" approach is not the law in Illinois; "[w]ords expressing contingency or dependence on a subsequent event or agreed-on element will do." <u>PFT Roberson, Inc.</u>, 420 F.3d at 732.

The Management Agreement specifically stated that "[t]he term of this Agreement shall commence on the date of <u>execution</u> of this Agreement and shall expire on the date ten (10) years subsequent to the date of the first public event held in the Arena (emphasis added)." The Agreement also provided:

BP represents and warrants to the City the following: (i) all required approvals have been obtained, and BP has full legal right, power and authority to enter into and perform its obligations hereunder, and (ii) this Agreement has been duly executed and delivered by BP and constitutes a valid and binding obligation of BP, enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally or by general equitable principles (emphasis added).

In Illinois, the term "execute" has been construed to mean "perform all necessary formalities, as to make and sign a contract, or sign and deliver a note." IK Corp., 558 N.E.2d at 168, citing Black's Law Dictionary 509 (5th ed. 1979). "Additionally, the term 'executed' imports the idea that nothing remains to be done." IK Corp., 558 N.E.2d at 168, citing Black's Law Dictionary 509 (5th ed. 1979). Based upon the language in the Management Agreement which states that the agreement commences on the date of "execution" and in which BP warrants that the agreement has been duly executed and delivered by BP, this court concludes that the agreement is unambiguous and required the execution of the agreement by BP.

In this case, there is no dispute that the Management Agreement was never signed by BP.

BP never formally accepted its obligations under the Management Agreement, including the payment of $2 million for naming rights and a further capital contribution of up to $1 million to purchase necessary restaurant concession equipment. Since that final execution never occurred, no binding agreement existed. See IK Corp., 558 N.E.2d at 169. This court therefore agrees with the

City that no enforceable contract existed between the City and BP.  This conclusion is bolstered by two additional considerations.  Although there is a factual dispute in this case regarding whether the City Council had the exhibits referred to in the Management Agreement prior to voting to accept the agreement, there is no real dispute that some of the exhibits were bilateral and trilateral agreements which required the approval of parties in addition to the City Council and were therefore incomplete and unexecuted.  This fact provides support for the City's argument that no complete, fully executed agreement between the City and BP ever existed.  Moreover, the facts clearly show that the Management Agreement provided that the City's agreement with CIA would "be terminated simultaneously with the execution of the Agreement in accordance with Exhibit A-2 hereof." Exhibit A-2 was never executed, and the City entered into a new, executed agreement with CIA, which gave CIA a right of first refusal as to the management of the Arena Project.  These facts also show that the Management Agreement never became an executed, complete, enforceable agreement between the City and BP.

This court is not persuaded by Plaintiffs' arguments to the contrary.  Plaintiffs have argued that Wheeling Tr. & Savings Bank v. City of Highland Park, 423 N.E.2d 245 (Ill App. Ct. 1981), supports their argument that the City Council's action in voting to accept the Management Agreement created a binding, enforceable agreement between the City and BP.  This court concludes, however, that Wheeling Tr. & Savings Bank is factually distinguishable.  The issue in that case was whether the City had entered into a valid, enforceable agreement even though the record showed that, when the City enacted ordinances regarding the agreement, not all provisions of the Municipal Code relating to the passage of ordinances were adhered to.  Wheeling Tr. & Savings Bank, 423 N.E.2d at 250.  In that case, the Illinois Appellate Court concluded that an agreement existed, noting that the legislative requirements were substantially complied with and

that, even if the passage of the ordinances by the City was characterized as a counter offer, it was accepted the same night by someone authorized to bind the plaintiff.  Wheeling Tr. & Savings Bank, 423 N.E.2d at 250.  The case did not discuss the effect of a written contract which required execution and was never executed by one of the parties to the agreement.

Plaintiffs have also argued that they accepted the Management Agreement by performance. In support of this argument, Plaintiffs stated that BP, through its members, provided "hundreds of hours of services" and "incurred extensive charges, fees, and expenses."  Plaintiffs stated that the services provided included coordination with the City in steps necessary to market municipal bonds, attendance at Arena Advisory Committee planning and development meetings, and work to obtain necessary contracts for the Arena with third parties.  This court has carefully reviewed and considered the documentation provided by Plaintiffs in support of this argument.  Following this review, this court agrees with the City that the vast majority of the "hundreds of hours of services" were performed by Butler and Nelson, whose entity, CIA, had an executed agreement with the City. For example, it was Butler and Nelson who attended the Arena Advisory Committee planning and development meetings.[5]  Under Illinois law, a contractually binding agreement may exist "where substantial action has been taken by one party in reliance upon the expressed intentions of the parties."  Interway, Inc., 407 N.E.2d at 620.  This court concludes that Plaintiffs have not shown that Plaintiffs themselves took substantial action in reliance on the City Council's vote to accept the agreement.  See Interway, Inc., 407 N.E.2d at 620-21.  The case law cited by Plaintiffs does not support a contrary decision because, in the cases cited, the performance relied upon was performance of actual obligations under the terms of the contract, such as payment of sums due

---

[5]  Plaintiffs noted that the minutes for those meetings identified Butler and Nelson as representatives of BP.  This court agrees with the City that this fact is not dispositive because there is no dispute that Butler and Nelson, through CIA, had an executed agreement with the City and were being paid for their services pursuant to that contract.

under the terms of the agreement, something that did not occur in this case.  See Newcourt Fin. USA, Inc. v. D & G Med. Sys., 2000 WL 528476, at *5 (N.D. Ill. 2000) (Newcourt performed by transferring the $150,000 for the medical equipment);  Falconbridge U.S., Inc. v. Bank One Ill., N.A., 240 B.R. 733, 734 (N.D. Ill. 1999), aff'd by In re Vic Supply Co., 227 F.3d 928 (7th Cir. 2000) (Bank One showed its acceptance of the Agreement by extending over $1 million in loans); St. Francis Med. Ctr. v. Vernon, 576 N.E.2d 1230, 1231 (Ill. App. Ct. 1991) (plaintiff accepted the contract by providing hospital care); cf. PFT Roberson, 420 F.3d at 732 (noting that the plaintiff did not try to accept by performance, such as by paying for tractor-trailer sets).

Plaintiffs also argue that the prior admissions by the City that an agreement existed create, by themselves, a genuine issue of material fact regarding the existence of an enforceable agreement. In support of this argument, Plaintiffs note that staff memos for City Council meetings held after the City Council's approval of the Management Agreement acknowledged the existence of an agreement between BP and the City.  Plaintiffs also note that Hamilton approved the press release about the Management Agreement and testified at his deposition that the City believed that an agreement between the City and BP existed.  Plaintiffs also rely upon the fact that the City Council voted to rescind the agreement on November 22, 2004, arguing that this action presupposed the existence of a valid agreement.

This court agrees with the City, however, that these facts do not change the unambiguous language in the Management Agreement that the Agreement did not commence until it was executed, something which BP undisputedly failed to do.  The City argues, persuasively, that Hamilton and the staff members who prepared the staff memos are not attorneys and could not make a determination as to whether an enforceable agreement existed and that, moreover, Hamilton believed there was an agreement because he did not know until later that BP had not signed the

24

Management Agreement.  On November 22, 2004, after Hamilton learned that BP had never signed the Agreement, Hamilton recommended that the City rescind its prior approval of the Management Agreement.  In voting, the City Council voted to rescind the agreement.  However, this court concludes that the disparity in language, by non-lawyers, regarding whether the vote was to rescind the prior approval or to rescind the agreement does not change the legal effect of the Management Agreement.

Plaintiffs have also argued, at length, that the "exhibit issue" does not show that no enforceable agreement existed between the City and BP.  Plaintiffs argue that the exhibits to the Management Agreement were prepared and provided to the City, and note that the City never complained about the lack of exhibits or the fact that some of the exhibits were not complete. However, as previously discussed, this court concludes that the fact that the exhibits were not complete simply provides support for the City's argument that no complete, fully executed agreement between the City and BP ever existed.

Plaintiffs also argue the existence of the Pre-Opening Sales and Management Agreement with CIA does not affect the enforceability of the Management Agreement.  As noted, Plaintiffs argue that the fact that the City bound itself to conflicting duties by executing the Management Agreement with BP and the Pre-Opening Sales and Management Agreement with CIA does not excuse the City from complying with the terms of the Management Agreement.  However, this court concludes that the Pre-Opening Sales and Management Agreement, which was fully executed, and which gave CIA rights as to the management of the Arena Project, provides additional support for the City's argument that the Management Agreement never became fully executed and enforceable.

For all of the reasons stated, this court concludes that the City is entitled to summary judgment on Count I of Plaintiffs' Second Amended Complaint.

25

This court concludes that Defendants' Motion for Partial Summary Judgment (#89) must be granted as well. This court recognizes that these Defendants did not specifically renew their Motion for Partial Summary Judgment following the filing of Plaintiffs' Second Amended Complaint. However, this Motion is tied to and dependent upon the City's Motion for Summary Judgment, which was renewed. Defendants argued that, if this court determined that no valid, enforceable agreement existed, they are entitled to summary judgment on Plaintiffs' claim of intentional interference with contract. This court agrees. Under Illinois law, the elements of a cause of action for tortious interference with a contractual relationship are: (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relationship; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) the subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages. Fieldcrest Builders, Inc. v. Antonucci, 724 N.E.2d 49, 61 (Ill. App. Ct. 1999); Amendola v. Backer & Spielvogel, Inc., 1988 WL 56240, at *4 (N.D. Ill. 1988). Because this court has found that the Management Agreement is not a valid, enforceable contract, Defendants' Motion for Partial Summary Judgment as to Count X (#89) is GRANTED.[6]

## ESTOPPEL

In its original Motion for Summary Judgment, the City argued that it was entitled to summary judgment on Count II of BP's First Amended Complaint which alleged equitable estoppel because BP did not allege actions showing detrimental reliance and did not provide any information as to how the entities which remain members of BP, the LLCs under the control of Adams, Kemp and LeFevre, relied to their detriment on promises made by the City Council. The City specifically

---

[6] The Motion actually requested judgment as to Count V of BP's First Amended Complaint. However, following the filing of the Second Amended Complaint, these Defendants are now entitled to summary judgment as to Count X of the Second Amended Complaint.

pointed out that BP had not alleged any financial contributions made by BP to the arena project.  The City argued that the remainder of the substantive actions BP alleged were actions by former partners Butler and Nelson, not Adams, Kemp or LeFevre.  The City contended that Adams, Kemp and LeFevre were "apparently proceeding under the illogical theory that the present makeup of [BP] can reap the benefits of efforts of Butler and Nelson," a premise the City categorized as "absurd."

In their Response, Plaintiffs argue that the equitable estoppel claim found in Count II of BP's First Amended Complaint is not included in the Second Amended Complaint.  Plaintiffs argue that Count IV of the Second Amended Complaint asserts a narrower theory, that the City's actions estop it from claiming that BP failed to deliver, sign or complete exhibits to the Management Agreement. Plaintiffs argue that this narrower claim is supported by the facts and applicable case law.  Plaintiffs contend that the City's argument that it is entitled to summary judgment on BP's no-longer-existing equitable estoppel claim is therefore moot.  In making their argument, Plaintiffs do not dispute the well settled law that, in order to invoke equitable estoppel against a municipality, they must prove two elements: (1) an affirmative act on behalf of the municipality, and (2) the inducement of substantial reliance by the affirmative act. Jordan v. Civil Serv. Comm'n, 617 N.E.2d 142, 145 (Ill. App. Ct. 1993).  Based upon the facts before this court, this court agrees with the City that Plaintiffs have failed to show "substantial reliance."  Plaintiffs argued only that hundreds of hours of work were performed by BP members following the approval of the Management Agreement by the City Council.  However, Plaintiffs do not dispute that the majority of these hours of work were performed by Butler and Nelson, who had a fully-executed contract with the City and were paid for their work. Plaintiffs also do not dispute that they have never claimed that BP made any financial contribution to the arena project.  This court therefore agrees with the City that Plaintiffs have failed to show "substantial reliance."

This court also concludes that the case law cited by Plaintiffs is not applicable to the facts here.  Plaintiffs have not cited any case law where estoppel has been applied under a similar set of circumstances.  This court concludes that the case relied upon by Plaintiffs, <u>City of Rochelle v. Suski</u>, 564 N.E.2d 933 (Ill. App. Ct. 1990), is factually distinguishable and provides no support for Plaintiffs' position.   This court therefore concludes that the City is entitled to summary judgment on Count IV of Plaintiffs' Second Amended Complaint which is based upon estoppel.

TORT CLAIMS

In its original Motion for Summary Judgment, the City noted that this court dismissed the counts of the First Amended Complaint against Hamilton, finding that Hamilton was immune from liability under the Tort Immunity Act.  The City argued that BP's tort claims against the City were based upon allegations that, because Hamilton, the City Manager, acted in a tortious manner, the City, as his employer, must be liable.  The City argued that, because this court has already concluded that Hamilton is not liable, the City also cannot be liable.

In their Response, Plaintiffs conceded that, if the conclusion set forth in this court's previous written opinion is adopted here, the reasoning would apply to the City as well.  Plaintiffs argued, however, that based upon the decision of the Illinois Supreme Court in <u>Van Meter v. Darien Park Dist.</u>, 799 N.E.2d 273, 285-86 (Ill. 2003),  the City has failed to establish its defense of immunity under the Tort Immunity Act.  Plaintiffs contended that, under <u>Van Meter</u>, a claim of discretionary immunity under the Tort Immunity Act is a "fact-intensive, case-by-case issue."  Plaintiffs pointed out that this court relied on <u>Vill. of Bloomingdale v. CDG Enter.</u>, 752 N.E.2d 1090 (Ill. 2001), in dismissing the claims against Hamilton.  Plaintiffs argued that the <u>Bloomingdale</u> case predates <u>Van Meter</u> and "is no longer good law."  Plaintiffs noted that they alleged that Hamilton had a non-discretionary duty to implement the Management Agreement adopted by the City Council.  Plaintiffs

28

also noted that they alleged that Hamilton deliberately acted to undermine the Management Agreement duly adopted by the City Council in order to benefit his friends and associates, contrary to his ministerial duty to implement the contract with BP. Plaintiffs argued that neither Hamilton nor the City have presented any evidence to the contrary, so factual issues exist and summary judgment on these claims is not appropriate.

In its Reply, the City argued that the Van Meter case did not reverse or limit Vill. of Bloomingdale. The City contended that, in Van Meter, the Illinois Supreme Court did not in any way mandate that some greater quantity of proof is necessary in order to grant a motion to dismiss or motion for summary judgment on the grounds of municipal immunity. The City argued that, in the current case, the record clearly shows that both Hamilton and the City took actions involving both the exercise of discretion and the making of policy.

This court has carefully reviewed both Van Meter and Vill. of Bloomingdale. Following this review, this court again concludes that this case falls squarely within the holding of Vill. of Bloomingdale. This court previously determined that, based upon Vill. of Bloomingdale, it was clear that the factual allegations in the First Amended Complaint showed that Hamilton was acting with judgment and discretion and was not engaging in a ministerial task that was "absolute, certain and imperative, involving merely the execution of a set task." This court has reviewed the allegations in Plaintiffs' Second Amended Complaint, and concludes that this is still true, notwithstanding Plaintiffs' conclusory allegation that Hamilton was engaging in "non-discretionary, ministerial duties." See Kevin's Towing, Inc. v. Thomas, 814 N.E.2d 1003, 1010 (Ill. App. Ct. 2004) (it was clear based upon factual allegations that the Mayor was not following a set policy in a routine manner). This court concludes that its prior Opinion dismissing the claims against Hamilton was correct. This court therefore agrees with the City that the City is entitled to summary

29

judgment on the same basis.  Hamilton's immunity also extends to the City, because the City "is not liable for an employee's actions when the employee is immune." Kevin's Towing, Inc., 814 N.E.2d at 1007, citing 745 Ill. Comp. Stat. 10/2-109 (West 2000).  Accordingly, this court grants the City's Motion for Summary Judgment as to Counts VIII, X, and XI of Plaintiffs' Second Amended Complaint.

IT IS THEREFORE ORDERED THAT:

(1) Plaintiffs' Motion to Strike (#123) is DENIED.

(2) The Motions for Summary Judgment (#85, #89, #104) are GRANTED.  Judgment is entered in favor of the City and against Plaintiffs on Counts I, IV, VIII, X and XI of Plaintiffs' Second Amended Complaint.  Judgment is entered in favor of Defendants John Butler, individually and d/b/a Butler Company, LLC, JBButler Company, LLC, Michael Nelson, MNelson Company, LLC, and Central Illinois Arena Management, Inc. and against Plaintiffs as to Count X of Plaintiffs' Second Amended Complaint.

(3) This decision only resolved Defendants' Motions for Summary Judgment and Plaintiff's Motion to Strike.  This court is well aware that numerous other motions remain pending in this case.  These motions will be decided in due course.  However, this court notes that this court has already extended discovery deadlines in a Discovery Order (#88) entered on April 24, 2006.  That Order set a discovery deadline of December 30, 2006, and a deadline for filing case dispositive motions of January 31, 2007.  This court now reiterates to the parties that it does not intend to extend these deadlines for any reason whatsoever.

ENTERED this 6th day of September, 2006

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE

30